UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/13/2023
```

-----------------------------------------------------------------------X
:
NIQUAN WALLACE,                                      :
:
                              Plaintiff,             :
:
                                                     :          21-cv-5757 (LJL)
              -v-                                     :
:          OPINION AND ORDER
CRAB HOUSE, INC. et al,                              :
:
                              Defendants.            :
:
-----------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

On May 12, 2022, this Court granted Defendants'[1] motion to dismiss the original

complaint without prejudice to the filing of an amended complaint. Dkt. No. 29 ("May 2022

Opinion"). Plaintiff Niquan Wallace ("Wallace" or "Plaintiff") timely filed an amended

complaint on June 11, 2022, Dkt. No. 30, and Defendants again moved to dismiss the amended

complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) on July 12, 2022, Dkt. No. 32.

For the following reasons, the motion to dismiss is granted with prejudice.

## BACKGROUND

Familiarity with the facts as alleged is presumed. For the purposes of this motion, the

Court accepts as true the well-pleaded factual allegations of the amended complaint.

Plaintiff, an African-American male, alleges that he was hired by non-defendant

corporation Red Panda Asian Bistro at the Lobster House Seafood Buffet Restaurant ("Lobster

House") as a "server/waiter." Dkt. No. 30 ¶¶ 6, 27. He worked at the Lobster House for

---

[1] "Defendants" are collectively defined as Crab House, Inc. ("Crab House") along with San-Kit
Cheng, Mengxing Wang, Songqiang Wang, and Haifan Wang (together, "Individual
Defendants").

approximately seven months from June 2019 to December 2019.  *Id*. ¶ 6.  Defendant Crab House is the alleged successor in interest to Lobster House.  *See id*. ¶¶ 22–26.

Plaintiff alleges that he was subject to race discrimination and a hostile work environment in violation of 42 U.S.C. § 1981, New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law. § 290 *et seq*., and New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq*.  The amended complaint groups his allegations into five categories.  Four categories are alleged under a section titled "Hostile Work Environment": (1) "Mischaracterization of Plaintiffs [sic] Work Title"; (2) "Defendants [sic] Work Practices" (consisting primarily of allegations related to the tables that he was stationed at); (3) "Work Schedule and Requesting for Time Off"; and (4) "False Accusations Made by Defendants."  A separate section and fifth category is titled "Termination."  Dkt. No. 30 ¶¶ 27–79.  These allegations generally repackage those in his original complaint.

In contrast to the original complaint, however, the amended complaint discretely identifies the titles of Plaintiff and his comparators.  The amended complaint describes Plaintiff as having been hired as a "waiter/server," *id*. ¶¶ 6, 27, and not also as a "runner," as alleged in the original complaint, *see* Dkt. No. 1 ¶ 28.  The two white female comparators, Kimberly Ann Gomez and Kasey Karisaridis, are described as having been hired as "server[s]," Dkt. No. 30 ¶¶ 40, 42, whereas their role was not alleged in the original complaint, *see* Dkt. No. 1 ¶¶ 49–58.  Aside from their titles, the amended complaint does not describe their duties, seniority, experience, or any other aspect about their positions, aside from stating that they had the "duties of a server," Dkt. No. 30 ¶¶ 40, 42.  The amended complaint states that neither had to "clean other tables" or "run food to other tables," and Gomez was also not asked to "clean the restaurant

at the end of the evening." *Id.*; *see also* Dkt. No. 1 ¶¶ 56, 58 (similar allegations in the original complaint).

The amended complaint also adds a paragraph identifying some of the Individual Defendants as potential comparators.  It states that "all the defendants that acted like servers, Mengxing Wang; Song Qiang Wang and Haifan Wang, were not required to clean tables; run food to tables or clean the restaurant at the end of the evening."  Dkt. No. 30 ¶ 43.  Plaintiff, however, also describes those individuals as occupying various management level roles in Lobster House and supervising Plaintiff.  *See id.* ¶¶ 15, 17–18, 20, 92.

The remainder of the allegations are similar to those in the original complaint.  For "Mischaracterization of Plaintiffs [sic] Work Title," Plaintiff realleges that he was asked to do jobs that were "not under his title" such as "run food to other tables; clean tables when customers were finished and clean the restaurant at the end of the evening."  *Id.* ¶¶ 28, 29; *see also* Dkt. No. 1 ¶¶ 28, 29, 31.  He again describes an individual named Alfonso Gonzalez, and another only identified as Ruben, again alleging that both were "male[s] of Spanish descent" who experienced similar treatment.  *See* Dkt. No. 30 ¶¶ 31–38; Dkt. No. 1 ¶¶ 36–38, 44–47.  Plaintiff again alleges that Gonzalez was "supposed to be plaintiffs' [sic] replacement."  Dkt. No. 30 ¶ 36; Dkt. No. 1 ¶ 44.

For "Defendants [sic] Work Practices," Plaintiff realleges that the lottery system ensured that he was "the only server that received the worst section of the restaurant which was the upstairs dining room," that Individual Defendants and Gomez and Karisaridis were never required to work there, that this led to him "being required to perform tasks that were outside his position," and that he "made the least amount of money in tips out of everyone."  Dkt. No. 30 ¶¶ 47–50; Dkt. No. 1 ¶¶ 40–41.  He states, however, that tips were pooled for the first six months

of his employment, leaving only his last month in which tips were individually determined.  Dkt. No. 30 ¶ 72.  Like the original complaint, Plaintiff again alleges that he was "required to act as bodyguard" which fell outside the "description of being a server," *id*. ¶ 55; Dkt. No. 1 ¶ 32, adding that it should have been the responsibility of San-Kit Cheng and Mengxing Wang to chase after non-paying customers, Dkt. No. 30 ¶ 55.

The other categories of allegations are likewise the same as the allegations in the original complaint.  For the allegations categorized "Work Schedule and Requesting for Time Off," Plaintiff generally realleges that he was denied his requests for time off because of his race and that he would lose out on a full day's work and pay if he arrived to work late, whereas Gomez would get requests for time off granted and would not be penalized.  *Id.* ¶¶ 56–61; Dkt. No. 1 ¶¶ 52–55.  Under "False Accusations Made by Defendants," he again alleges that he was accused of stealing tip money, but claims that he did not do so.  Dkt. No. 30 ¶¶ 62–65; Dkt. No. 1 ¶¶ 33, 35.  He also states that he was "not . . . allowed to go behind the cash register" as a result.  Dkt. No. 30 ¶ 65.  Ruben and Gonzalez were not allowed to go behind the register as well, although Gomez and Karisaridis were allowed to do so.  *Id.* ¶ 70; Dkt. No. 1 ¶¶ 43, 51.  Under "Termination," Plaintiff alleges an incident in which he nonetheless went behind the register and took "pictures of the computer with all the employees' information on it."  Dkt. No. 30 ¶ 75. Plaintiff claims that he was there to look at his paystubs and take pictures of his paystubs.  *Id.* ¶ 74.  Defendant San-Kit Cheng then fired Plaintiff because he believed Plaintiff was stealing other servers' tips and other employee's payroll information from the computer.  *Id.* ¶ 76.  Those allegations are substantially the same as those in the original complaint.  *See id.* ¶¶ 71–79; Dkt. No. 1 ¶¶ 59–64.

Finally, Plaintiff alleges that Crab House is the successor to Lobster House and is liable as successor for the claims that arose out of incidents involving Lobster House.  Dkt. No. 30 ¶¶ 22–26.  To establish successor liability, Plaintiff alleges that Crab House had notice of the charge or pending lawsuit prior to acquiring the business "given that the owners are aware that [Plaintiff] was uncomfortable with the way in which he was being treated because of his race." *Id*. ¶ 22.  There are no other details provided on how Crab House acquired the business of Lobster House or how or why the owners of Crab House would have been aware of such discomfort at Lobster House.  The amended complaint alleges that all Lobster House employees transferred over to Crab House in or around April 2021 when Lobster House closed.  *Id*. ¶ 23.  Plaintiff then asserts that Lobster House and Crab House shared a high degree of interrelated and unified operation and common ownership in the individuals of San-Kit Cheng, San-Yiu Cheng, and San-Chong Cheng.  *Id*. ¶ 24.  Lobster House's website further states that it is closed due to the ongoing pandemic and directs customers to go to the Crab House instead, while also listing Crab House as Lobster House's "new location."  *Id*. ¶ 25.  Plaintiff ends by pleading for successor liability because Lobster House is no longer able to provide relief and that "there is substantial continuity in business operations . . . despite the change of location" because "Carb [sic] House uses the same and substantially the same supervisory personnel, and the same job exists under the same conditions."  *Id*. ¶ 26.

## PROCEDURAL HISTORY

Plaintiff filed his original complaint on July 4, 2021.  Dkt. No. 1.  On January 4, 2022, Defendants filed their motion to dismiss for failure to state a claim for relief along with a memorandum of law in support.  Dkt. Nos. 19–20.  Plaintiff filed his response to the motion to dismiss on January 18, 2022.  Dkt. No. 23.  No reply memorandum was filed.  The Court granted

Defendants' motion to dismiss the original complaint without prejudice to the filing of an amended complaint on May 12, 2022.  Dkt. No. 29.

Plaintiff filed his amended complaint on June 11, 2022.  Dkt. No. 30.  Defendants again moved to dismiss on July 12, 2022.  Dkt. No. 32.  Plaintiff filed his opposition on July 19, 2022.  Dkt. No.  34.  Defendants filed their reply memorandum in support of the motion on July 28, 2022.  Dkt. No. 35.

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 570 (2007)).  A complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement" in order to survive dismissal.  *Twombly*, 550 U.S. at 555, 557.  The ultimate question is whether "[a] claim has facial plausibility, [*i.e.*,] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.  Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]."  *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).

**DISCUSSION**

Plaintiff alleges the five same claims as in the original complaint.  His claims in the amended complaint are: (1) race discrimination in violation of 42 U.S.C. § 1981, Dkt. No. 30 ¶¶ 80–84; (2) hostile work environment in violation of 42 U.S.C. § 1981, Dkt. No. 30 ¶¶ 85–88; (3) race discrimination in violation of NYSHRL, Dkt. No. 30 ¶¶ 89–90; (4) aiding and abetting discrimination in violation of the NYSHRL, Dkt. No. 30 ¶¶ 76–80; and (5) race discrimination in violation of NYCHRL, Dkt. No. 30 ¶¶ 96–97.  Plaintiff again seeks a declaratory judgment, injunctive relief, compensatory damages, backpay, and reinstatement.  *Id.* at 15–16.

For the following reasons, the Court dismisses the claims arising under Section 1981 and declines to exercise supplemental jurisdiction over the remaining claims arising under New York State law and New York City law.

**I.      Successor Liability under 42 U.S.C. § 1981**

Defendants move to dismiss the amended complaint on the ground that Plaintiff has inadequately alleged successor liability under Section 1981—a new ground not asserted in their previous motion to dismiss.  *See* Dkt. No. 33 at 2–5.  They note that there are two relevant tests in New York—the (1) substantial continuity test and (2) the traditional common law test—and first argue that Crab House did not make the purchase of assets required for liability under either test.  *Id.*  They also contend that Plaintiff's pleadings are inadequate to satisfy the substantial continuity test.  *Id.* at 3–4.  Plaintiff argues that he satisfies both tests, emphasizing that Crab House was a "mere continuation of the selling corporation."  Dkt. No. 34 at 6–11.

For the following reasons, the Court concludes that Plaintiff has not adequately pleaded successor liability and dismisses the Section 1981 claims as against defendant Crab House.

"Under both New York law and traditional common law, a corporation that purchases the assets of another corporation is generally not liable for the seller's liabilities."  *N.Y. v. Nat'l Serv.*

*Indus., Inc.*, 460 F.3d 201, 209 (2d Cir. 2006).  The corporation which purchases the stock or substantially all of the assets of another corporation does not thereby become liable for the torts of that corporation; liability remains with the corporation that committed the torts.  *See* 15 Fletcher's Cyclopedia Corporations Rev. Ed. § 7122; *see also United States v. Bestfoods*, 524 U.S. 51, 63 (1998) (describing the "well-settled rule" under common law and corporate law principle of corporate separateness and veil piercing); *New York v. Nat'l Servs. Indus., Inc.*, 352 F.3d 682, 685 (2d Cir. 2003) (describing this common law rule and contrasting it with a substantial continuity test); *Brzozowski v. Corr. Physician Servs., Inc.*, 360 F.3d 173, 177 (3d Cir. 2004) ("At common law, where one corporation sells or transfers all or a substantial part of its assets to another, the transferee does not become liable for the debts and liabilities, including torts, of the transferor."); *Schumacher v. Richards Shear Co.*, 451 N.E.2d 195, 198 (N.Y. 1983) ("It is the general rule that a corporation which acquires the assets of another is not liable for the torts of its predecessor.").  Under common law and the law of New York, the exceptions to the general rule are limited.  A purchaser is liable where (1) it expressly assumes liability; (2) the transaction amounts to a consolidation or merger; (3) the transaction is fraudulent and intended to escape liability; or (4) the purchaser is a mere continuation of the seller.  15 Fletcher's Cyclopedia Corporations Rev. Ed. § 7122; *Nat'l Serv. Indus., Inc.*, 460 F.3d at 209 (describing these exceptions as "traditional common law rules"); *Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 45 (2d Cir. 2003) (restating them under New York common law); *Brzozowski*, 360 F.3d at 177 (describing them under common law and citing the Fletcher treatise).

A different doctrine, "the substantial continuity doctrine[,] is well established in the area of labor law." *Nat'l Servs. Indus., Inc*., 352 F.3d at 686.  Under that doctrine, where there has been a sale of substantially all assets, courts look into nine factors:

(1) whether the successor company had notice of the charge or pending lawsuit prior to acquiring the business or assets of the predecessor; (2) the ability of the predecessor to apply relief; (3) whether there has been a substantial continuity of business operations; (4) whether the new employer uses the same plant; (5) whether it uses the same or substantially the same work force; (6) whether it uses the same or substantially the same supervisory personnel; (7) whether the same jobs exist under substantially the same working conditions; (8) whether it uses the same machinery, equipment, and methods of production; and (9) whether it produces the same product.

*Chen v. L&L New Beginnings LLC*, 2022 WL 2306946, at *2 (S.D.N.Y. June 27, 2022)

(alterations accepted) (quoting *Patino v. Brady Parking, Inc.*, 2017 WL 5198192, at *10

(S.D.N.Y. Oct. 31, 2017)).

The substantial continuity doctrine has been adopted by the Second Circuit and several

other Circuits for claims under Title VII. *See Forde v. Kee Lox Mfg. Co.*, 584 F.2d 4, 5–6 (2d

Cir. 1978) (holding in Title VII context that "[f]or an employer to be considered a successor

there must be 'substantial continuity of identity in the business enterprise before and after a

change'" (quoting *John Wiley & Sons v. Livingston*, 376 U.S. 543, 551 (1964))); *see also*

*Brzozowski,* 360 F.3d at 177–79 (describing relevant substantial continuity factors to establish

"successorship liability in the appropriate Title VII context"); *Wheeler v. Snyder Buick, Inc.*, 794

F.2d 1228, 1236 (7th Cir. 1986) (stating in employment discrimination context that "[t]he court

analogized from cases holding successor employers liable in suits brought under the National

Labor Relations Act"); *EEOC v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086, 1090–94

(6th Cir. 1974) (same).  It has also been applied by several Circuits specifically in the Section

1981 context.  *See*, *e.g.*, *Musikiwamba v. ESSI, Inc.*, 760 F.2d 740, 750 (7th Cir. 1985) (applying

but distinguishing the factors under the substantial continuity test); *see also Steinbach v.*

*Hubbard*, 51 F.3d 843, 845 (9th Cir. 1995) (describing how it is a "federal common law

successorship doctrine that now extends to almost every employment law statute" and citing

*Musikiwamba*).  Courts in this Circuit have also applied the test in the context of the Fair Labor

Standards Act of 1938, *see Ji Li v. New Ichiro Sushi, Inc.*, 2020 WL 2094095, at *4 (S.D.N.Y.

Apr. 30, 2020); *Xue Ming Wang v. Abumi Sushi Inc.*, 262 F. Supp. 3d 81, 89 (S.D.N.Y. 2017);

*Bautista v. Beyond Thai Kitchen, Inc.*, 2015 WL 5459737, at *4 (S.D.N.Y. Sept. 17, 2015);

*Battino v. Cornelia Fifth Ave., LLC*, 861 F. Supp. 2d 392, 402–06 (S.D.N.Y. 2012), a statute that

has been analogized, through its regulation of working conditions and remedial purpose, to

Section 1981 and Title VII, *see Steinbach*, 51 F.3d at 845; *Battino*, 861 F. Supp. 2d at 403.

Moreover, the Second Circuit has held that Section 1981 should generally be interpreted in

parallel with Title VII. *See Vill. of Freeport v. Barrella*, 814 F.3d 594, 616 (2d Cir. 2016)

(noting that "the same substantive standards govern claims under both statutes"); *Wiercinski v.

Mangia 57, Inc.*, 787 F.3d 106, 113 (2d Cir. 2015) ("The same core substantive standards that

apply to claims of discriminatory conduct in violation of Title VII . . . are also applicable to

claims of discrimination in employment in violation of [Section] 1981." (internal quotation

marks and citation omitted)); *see also Ash v. Tyson Foods, Inc.*, 664 F.3d 883, 904 (11th Cir.

2011) ("[T]he analytical framework and rules about employer liability under Title VII and

[Section] 1981 are the same."). It thus follows that under the law of this Circuit, as it currently

stands, the substantial continuity doctrine applies to claims of successor liability under Section

1981.[2] *See*, *e.g.*, *Wheeler*, 794 F.2d at 1236 (holding that the Section 1981 substantial continuity

doctrine extends to Title VII context).

---

[2] The Court pauses to observe that this conclusion is not free from doubt. In *United States v. Bestfoods*, 524 U.S. 51 (1998), the Supreme Court held that the common-law doctrine of successor liability and not the substantial continuity doctrine should be applied to claims under CERCLA because the statute "like many another congressional enactment[s] . . . [,] giv[es] no indication that the entire corpus of state corporation law is to be replaced simply because a plaintiff's cause of action is based upon a federal statute, and the failure of the statute to speak to a matter as fundamental as the liability implications of corporate ownership demands application of the rule that [i]n order to abrogate a common-law principle, the statute must speak directly to the question addressed by the common law." *Id*. at 63 (internal citations and quotation marks

"[U]nder either test successor liability focuses on whether a *purchaser* is liable for claims against the seller's company." *Chen*, 2022 WL 2306946, at *2 (quoting *De Quan Lu v. Red Koi, Inc.*, 2020 WL 7711410, at *4 (S.D.N.Y. Dec. 29, 2020)) (emphasis in original).  It is a necessary but not a sufficient condition that there be a substantial continuity of the business.  The owners or managers of a judgment-proof entity may form a new and substantially similar business without thereby assuming the predecessor's liabilities.[3]  The imposition of successor liability in the case of federal labor and employment statutes is justified on the theory that it is

> often . . . necessary to achieve the statutory goals because the workers will often be unable to head off a corporate sale by their employer aimed at extinguishing the employer's liability to them. . . .  In the absence of successor liability, a violator of the Act could escape liability, or at least make relief much more difficult to obtain, by *selling its assets without an assumption of liabilities by the buyer* (for such an assumption would reduce the purchase price by imposing a cost on the buyer) and then dissolving.

*Teed v. Thomas & Betts Power Solutions, L.L.C.*, 711 F.3d 763, 766 (7th Cir. 2013) (Posner, J.) (emphasis added).  But a sale of all or substantially all assets is a necessary precondition to the application of the doctrine.  The test seeks to "ensure fairness" by making it critical that the putative successor have notice of the predecessor's legal obligation before the sale of assets so that the "successor ha[s] an opportunity to protect against liability by negotiating a lower price or indemnity clause."  *Steinbach*, 51 F.3d at 847 (citing *Golden State Bottling Co. v. N.L.R.B.*, 414 U.S. 168, 185 (1973)); *see also Musikiwamba*, 760 F.2d at 752 ("The successor doctrine is derived from equitable principles, and it would be grossly unfair, except in the most exceptional

---

omitted). As the Honorable Judge Gregory H. Woods has observed, however, "the Circuit's decision applying the [substantial continuity] test to claims under Title VII has not been overruled," and while there may be room to argue that *Forde* is no longer good law, "such a result is far from clear and is not for this Court to decide."  *Xue Ming Wang*, 262 F. Supp. 3d at 89.

[3] Plaintiff asserts that Lobster House has filed a petition for protection under the Bankruptcy Code.  Dkt. No. 34 at 10.

circumstances, to impose successor liability on an innocent purchaser when the predecessor is fully capable of providing relief or when the successor did not have the opportunity to protect itself by an indemnification clause in the acquisition agreement or a lower purchase price."); *see also Battino*, 861 F. Supp. 2d at 406 (explaining the same as the "principal reason for the notice requirement"); *see also Rojas v. TK Commnc'ns, Inc.*, 87 F.3d 745, 750 (5th Cir. 1996) ("[T]he first two factors [of notice and the ability of the predecessor to provide relief] are critical."). Where there is no sale of assets—and no transaction between the predecessor and the alleged successor—there is no means by which the successor can protect itself.  A clever plaintiff unable to otherwise establish alter ego liability would nonetheless be able to do so, effectively piercing the corporate veil and imposing successor liability by merely alleging that the owners of the prior business were identical to the owners of the new business and had decided to continue the operations of the earlier business albeit in different corporate form.  A plaintiff unable to establish the elements for holding the owner directly liable, such as a disregard of corporate formalities, inadequate capitalization, and intermingling of funds, *see Sesa. Inc. v. Terrafina*, 2020 WL 6382919, at *4 (S.D.N.Y. Oct. 30, 2020), would be able effectively to reach the same end, by showing that the owner's earlier business and his later business were the same even if—with respect to both—the owner respected all corporate formalities.

Plaintiff's allegations fail on several fronts.  First, Plaintiff fails to allege that Lobster House sold its assets to Crab House.  The amended complaint asserts that Crab House had notice "prior to acquiring the business *or* assets of the predecessor."  Dkt. No. 30 ¶ 22 (emphasis added); *id*. ¶ 26.  But this allegation in the disjunctive is insufficient to plead facts that there was a sale or otherwise a transfer of all or substantially all assets.  *See*, *e.g.*, *Gavish v. Revlon, Inc.*, 2004 WL 2210269, at *13 (S.D.N.Y. Sept. 30, 2004) ("[T]he complaint's use of the disjunctive

"or" greatly diminishes its probative value"); *Van Eck v. Cimahosky*, 329 F. Supp. 2d 265, 270 (D. Conn. 2004) (noting that "the present [c]omplaint is disjunctive and often vague," and, had the plaintiff not been pro se, "might possibly be dismissed for a failure of specificity"); *Gold v. Fields*, 1993 WL 212672, at *6 (S.D.N.Y. June 14, 1993) ("[T]he use of the term 'and/or' . . . means that the complaint not only fails to allege what exact statements were made and when they were made, but it also fails even to allege specifically that it was a defendant rather than someone else who, in fact, made those statements.").  The act of a corporation in selling substantially all of its assets to a new and successor corporation is different from the acts of the owners of a corporation in setting up a new corporation engaged in the same business with the same customers and the same menu as its earlier corporation.  Crab House could, and from the allegations of the Amended Complaint did, in the vernacular, "acquire the business" of Lobster House when the owners and operators of Lobster House referred both its customers and its employees to Crab House.  That did not require any transaction at all.  It could be accomplished by the simple act of the owner abandoning the old business and starting a new business.  Plaintiff thus has not alleged the necessary predicate for successor liability—that the corporation sought to be held liable engaged in a transaction pursuant to which it purchased or acquired all or substantially all of the assets of the corporation that committed the tort.[4]  *See* 15 Fletcher Cyc. Corp. § 7122 ("[A] prerequisite to the imposition of liability against a corporation under any of

---

[4] It is telling that each of the cases cited by Plaintiff for successor liability involved an asset sale. *See generally Douglas v. Stamco*, 363 F. App'x 100, 102 (2d Cir. 2010) (holding that successor liability not available against bankrupt corporation which sold all of its assets because that would defeat the priority scheme of the Bankruptcy Code); *Nat'l Serv. Indus., Inc.*, 460 F.3d 201 (sale by predecessor corporation of almost all of its assets); *Hayes v. Equality Specialties*, 740 F. Supp. 2d 474 (S.D.N.Y. 2010) (asset sale agreement); *Desclafani v. Pave-Mark Corp.*, 2008 WL 3914881 (S.D.N.Y. Aug. 22, 2008) (asset sale agreement); *Doktor v. Werner Co.*, 762 F. Supp. 2d 494 (E.D.N.Y. 2011) (bankruptcy sale of substantially all assets); *Ladjevardian v. Laidlaw-Coggeshall, Inc.*, 431 F. Supp. 834 (S.D.N.Y. 1977) (asset sale).

the exceptions to the nonliability of successors is a transfer or sale of all, or substantially all, the assets of the predecessor to the successor."); *Battino*, 861 F. Supp. 2d at 404 (noting that the substantial continuity doctrine applies in the context of assets, and that in a sale of stock, the acquirer "acquires the assets and liabilities of the seller"); *see also Nat'l Serv. Indus., Inc.*, 460 F.3d at 205 ("The de facto merger doctrine creates successor liability when the *transaction* between the purchasing and selling companies is in substance, if not in form, a merger." (emphasis added)).

As important, the amended complaint also does not allege that Crab House was aware of Plaintiff's claim prior to any purported acquisition of assets.  While "[t]he knowledge of a director, officer, sole shareholder or controlling person of a corporation is imputable to that corporation," *Battino*, 861 F. Supp. 2d at 405 (quoting *Baker v. Latham Sparrowbush Associates*, 72 F.3d 246, 255 (2d Cir.1995)), the successor must have notice of a claim before it acquires its predecessor's assets for it to assume liability.  If the successor does not have notice of the claim, it is unable to "protect against liability by negotiating a lower price or indemnity clause." *Id.* at 406 (quoting *Steinbach*, 51 F.3d at 847).  The successor need not have notice of an actual lawsuit. *Id.* at 405–06.  The purposes of the successor liability doctrine would be defeated if a corporation could escape the claim of its injured victim by suddenly selling all of its assets upon the eve of the filing of a lawsuit.  The lawsuit need not actually have been filed for the successor to protect itself through a reduced price of an indemnity clause.  But, to assume liability for the alleged discriminatory acts of its predecessor, the successor usually must at least have notice of the existence of a claim. *Id.* at 407 ("[I]t would be very difficult for a third party to have notice of any potential liability for discriminatory practices unless someone in some way complained about those practices.").

Plaintiff's factual allegations do not meet that standard.  All that the amended complaint alleges is that the "owners are aware that [Plaintiff] was uncomfortable with the way in which was being treated because of his race."  Dkt.  No. 30 ¶ 22.  The statement is entirely conclusory.  It is insufficient in two respects.  First, that the owners were aware of the fact that Plaintiff was uncomfortable with how he was treated because of his race falls far short of alleging that the owners were aware of that Plaintiff had a claim for discrimination on the basis of his race.  The subjective feeling of discomfort is not sufficient to make out a claim for hostile work environment, much less a claim for adverse employment action.  *See Williams v. County of Westchester*, 171 F.3d 98, 101 (2d Cir. 1999) (subjective feelings of discomfort are insufficient to make out a claim of a racially hostile work environment); *Craig v. Yale Univ. Sch. of Med.*, 2013 WL 789718, at *13 (D. Conn. Mar. 4, 2013) ("[C]onduct is not sufficiently severe if a plaintiff can only show generalized feelings of discomfort" (internal quotation marks omitted)); *Kunzler v. Canon, USA, Inc.*, 257 F. Supp. 2d 574, 583 (E.D.N.Y. 2003) ("[F]eelings of 'discomfort' cannot support a hostile environment claim."); *Tucker v. Johnson*, 211 F. Supp. 3d 95, 101–02 (D.D.C. 2016) ("General feelings of workplace discomfort or unease . . . are simply not enough to support a claim for hostile work environment."); *see also Adams-Flores, v. City of New York, et al.*, 2023 WL 2266478, at *5 (S.D.N.Y. Feb. 28, 2023) ("Put simply, her feelings of discomfort, frustration, and marginalization are insufficient to establish that she suffered an adverse employment action."); *Jones v. New York City Bd. of Educ.*, 2012 WL 1116906, at *10 (S.D.N.Y. Apr. 2, 2012) ("[A] plaintiff's subjective feelings cannot be used to determine whether an employment action is adverse." (citation omitted)).  There is no allegation that Crab House was aware of any specific act by Lobster House that could have given rise to liability.  *See Rowe Entertainment, Inc. v. William Morris Agency, Inc.*, 2005 WL 22833, at *79

(S.D.N.Y.  Jan. 5, 2005) (holding that allegation that successor was aware that for years predecessor had been violating the civil rights of black promoters was insufficient to establish notice because the complaint failed to allege that Defendants had notice "of any acts of discrimination against them based on race").

Second, the amended complaint does not allege how or why the owners would have any awareness that Plaintiff would have a claim against Lobster House for discrimination, even if somehow discomfort could be equated with discrimination.  For the successor to have notice of a claim, the claim must be sufficiently concrete that the successor can negotiate an indemnity or a reduced price.  *Battino*, 861 F. Supp. 2d at 406.  Notice must be received before the transaction is agreed and the potential claim cannot be entirely inchoate.  All that the amended complaint alleges here, however, it that the owners were "aware" of Plaintiff's discomfort.  It does not allege what they became aware of, how they became aware of it, and when they became aware of it.  In the absence of any such allegations, Plaintiff cannot state a claim for successor liability. *See*, *e.g.*, *Lewis v. Blackman Plumbing Supply L.L.C.*, 51 F. Supp. 3d 289, 315 (S.D.N.Y. 2014) (finding that plaintiff did not meet substantial continuity test because plaintiff did not file the action or "any formal complaints prior to the purchase"); *William Morris Agency, Inc.*, 2005 WL 22833, at *79, *aff'd*, 167 F. App'x 227 (2d Cir. 2005) (finding no notice when it relied entirely on "conclusory statement" that defendant "had for years been violating the civil rights of black promoters"); *E.E.O.C. v. Barney Skanska Const. Co.*, 2000 WL 1617008, at *3 (S.D.N.Y. Oct. 27, 2000) (finding no evidence of notice); *Shevack v. Litton Applied Tech.*, 1998 WL 512959, at *3 (S.D.N.Y. Aug. 18, 1998) (dismissing successor liability because the "claim did not arise prior to acquisition").[5]

_____

[5] In his brief in opposition to the motion to dismiss, Plaintiff states that Crab House "had notice

Moreover, even passing that, Plaintiff's allegations here would not suffice to hold Crab House liable for Lobster House's torts on a joint-employer theory of liability, and thus could not establish liability on a successor liability.[6]  Plaintiff's sole allegations are that Lobster House's website identifies Crab House as Lobster House's "new location," that the two corporations have the some overlapping officers and supervisory personnel, and that the same job of a server exists at the new restaurant.  Dkt. No. 30 ¶¶ 25–26; *see also* Dkt. No. 34 at 7–8.  These allegations would not be sufficient to show that two businesses operated as a single integrated enterprise sufficient for one to have liability for the torts of the other; they are entirely consistent with the two corporations being run as *independent* enterprises.  *See Huer Huang v. Shanghai City Corp.*, 459 F. Supp. 3d 580, 587 (S.D.N.Y. 2020) (holding that a common website and conclusory allegations of a common owner and manager were insufficient to show the presence of a joint employer); *Apolinar v. R.J. 49 Rest., LLC*, 2016 WL 2903278, at *4 (S.D.N.Y. 2016).  It should be *a fortiori* where the two businesses are not simultaneously run by the same management, that the fact that the second business picks up some of the employees of the first, that the managers of the first business also later run the second, and that the owners of the first business use their

---

of the charge or pending lawsuit prior to acquiring the business or assets of the predecessor [because] the predecessors were litigating a lawsuit in the Eastern District Court where Plaintiff was a party during the time of that Defendants acquiring the property that serves as Crab House [sic]."  Dkt. No. 34 at 9.  The Court disregards the allegation as "it is axiomatic that the [c]omplaint cannot be amended by the briefs in opposition to a motion to dismiss."  *O'Brien v. Nat'l Prop. Analysts Partners*, 719 F. Supp. 222, 229 (S.D.N.Y. 1989).  Even then, that action was about alleged violations of New York Labor Law and Fair Labor Standards Act, *see Karaisaridis v. Red Panda Asian Bistro Inc. et al.*, No. 19 Civ. 3780, Dkt. No. 1 (E.D.N.Y. June 28, 2019), which would not have put Crab House on notice of any allegations regarding racial discrimination, or a suit towards one of the non-class representative members of the class.

[6] The amended complaint does not raise joint employer liability and neither does the briefing. Plaintiff has forfeited this theory of liability as an independent basis for imposing liability on Crab House.  Irrespective of Plaintiff's forfeiture, the Court finds that any such allegation would be meritless.

website to advertise the business of the second is not sufficient to satisfy the nine-factor test to establish substantial continuity.[7]

For these reasons, the Court dismisses all of Plaintiff's claims against Crab House.

## II.  Employment Discrimination under 42 U.S.C. § 1981

Because the Individual Defendants may be found individually liable for claims under Section 1981 despite the dismissal of all claims against Crab House, *see Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2d Cir. 2000) (making explicit that "individuals may be held liable under [Section] 1981"), the Court proceeds to assess the Section 1981 claims against the Individual Defendants.  As to the remaining Individual Defendants, Plaintiff realleges his employment discrimination claims on the basis of race under Section 1981, NYSHRL, and NYCHRL.  Defendants argue that Plaintiff is not qualified and has not sufficiently alleged that his adverse employment actions occurred under circumstances giving rise to an inference of discrimination.  Dkt. No. 33 at 6–7.  Both parties agree that Plaintiff was a member of a protected class and that his termination was an adverse employment action.  *Id.* at 6.

"To establish a claim under [Section] 1981, a plaintiff ... must show: (1) that [he] is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerning one of activities enumerated in [Section] 1981."  *Lauture v. International Bus. Machs. Corp.*, 216 F.3d 258, 261 (2d Cir. 2000).

---

[7] All the amended complaint asserts, with respect to control, are allegations that San-Kit Cheng and San-Yiu Cheng were "common management," Dkt. No. 30 ¶ 24, but that allegation is entirely conclusory and insufficient to establish a claim for relief.  *See Huer Huang*, 459 F. Supp. 3d at 588–59.  The amended complaint, on closer inspection, indicates that the common management and control materially differed between the two restaurants.  Haifan Wang and Mengxing Wang also had "managerial authority" at Lobster House and are not alleged to have such authority at Crab House, *see* Dkt. No. 30 ¶¶ 17, 18, 20, 21, 24, and San-Yiu Cheng did not have any authority at Crab House.  San-Kit Cheng also left responsibility of the restaurant to Mengxing Wang before Plaintiff's adverse employment action of termination.  *Id.* ¶ 71.

The Court previously concluded that Plaintiff sufficiently pleaded that he was well qualified for the position.[8]  The Court first analyzes whether Plaintiff has alleged an adverse employment action and then analyzes whether Plaintiff has pleaded an inference of discriminatory intent.

### A.    Adverse Employment Action

Plaintiff appears to assert that the following conduct constituted adverse employment decisions: the denial of his requested leave and enforcement of the late arrival policy, his additional responsibilities, false accusations that Plaintiff stole tips, his placement at the upstairs tables, and his termination.  *See* Dkt. No. 34 at 14–15.  "An adverse employment action is a materially adverse change in the terms and conditions of employment [that] is more disruptive than a mere inconvenience or an alteration of job responsibilities."  *Demoret v. Zegarelli*, 451 F.3d 140, 151 (2d Cir. 2006) (internal quotation marks and citation omitted).  "[I]t is important to separate significant from trivial harms."  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).  "A materially adverse change may be indicated by a termination of employment; a demotion with a decrease in wage or salary or a less distinguished title; a material loss of

---

[8] Defendants argue that Plaintiff was not qualified for the role.  *See* Dkt. No. 20 at 3.  This argument is foreclosed by law of the case.  The May 2022 Opinion held that Plaintiff "has alleged that he performed his duties with skill, dedication, and dignity and that he performed a variety of duties at the restaurant, including waiting tables, during the over six months that he worked at the restaurant."  Dkt. No. 29 at 10.  None of the relevant factual allegations that informed that determination have changed in Plaintiff's amended complaint.  *Cf. City of Philadelphia v. Bank of Am. Corp*., 609 F. Supp. 3d 269, 282 (S.D.N.Y. 2022) ("[W]here . . . a plaintiff has filed an amended complaint following an earlier ruling, the law of the case doctrine does not apply to the extent that the plaintiff has offered new claims or factual allegations." (cleaned up)).  Defendants do not provide any compelling rationale or any intervening change of law indicating why the Court should reconsider that determination.  *See Keawsri v. Ramen-Ya Inc.*, 2022 WL 3152572, at *3 (S.D.N.Y. Aug. 8, 2022) ("Defendants offer no cogent and compelling reasons justifying a departure from the law of the case." (internal quotation marks and citation omitted)).

benefits; significantly diminished material responsibilities; or other indices unique to a particular situation." *Borrero v. Am. Exp. Bank Ltd.*, 533 F. Supp. 2d 429, 436 (S.D.N.Y. 2008).

Under these standards, Plaintiff's allegation that he was denied leave and that Defendants strictly enforced their late policy against him do not constitute adverse employment decisions. *See*, *e.g.*, *Williams v. N.Y.C. Hous. Auth.*, 335 F. App'x 108, 110 (2d Cir. 2009) (denial of request of leave of absence); *Richards v. Department of Education of City of New York*, 2022 WL 329226, at *9 (S.D.N.Y. 2022) (noting that "allegations regarding Plaintiff's difficulty in receiving bereavement leave, the requirement that Plaintiff inform Farnham a day in advance when she planned to leave early, and Plaintiff's inability to add her half-hour lunch to the end of her workday" were not adverse employment actions) (citing cases); *Walder v. White Plains Bd. of Educ.*, 738 F. Supp. 2d 483, 498 (S.D.N.Y. 2010) (denial of "late entry"); *Tompkins v. Allied Barton Sec. Servs.*, 2010 WL 3582621, at *3 (S.D.N.Y. Sept. 13, 2010), *aff'd sub nom. Tompkins v. AlliedBarton Sec. Servs.*, 424 F. App'x 42 (2d Cir. 2011) (denial of time off); *Ebanks v. Neiman Marcus Grp., Inc.*, 414 F. Supp. 2d 320, 333 (S.D.N.Y. 2006) (denial of leave); *Little v. Nat'l Broad. Co.*, 210 F. Supp. 2d 330, 378 (S.D.N.Y. 2002) (not being permitted to arrive late).

Plaintiff also has not alleged in anything other than in a conclusory manner that any of his additional responsibilities were materially adverse. He only alleges that they "fell outside the description of being a server." Dkt. No. 30 ¶¶ 29, 55. That is not sufficient. "[C]ourts have repeatedly held that a change in duties—even from a job that the plaintiff 'cherished'—does not constitute an adverse employment action." *Morrison v. Potter*, 363 F. Supp. 2d 586, 590 (S.D.N.Y. 2005) (collecting cases). Further, "[t]he assignment of a disproportionate amount of work may constitute an adverse employment action if the additional work significantly changed the employee's responsibilities so as to diminish that worker's role or status, or exposed the

worker to dangerous or extreme conditions not appropriate to her job classification." *Collazo v. Cnty. of Suffolk*, 163 F. Supp. 3d 27, 43 (E.D.N.Y. 2016) (internal quotation marks and citation omitted). He does not allege that his title or pay changed or that he was subject to any dangerous conditions. *See*, *e.g.*, *Kenny v. Cath. Charities Cmty. Servs. Archdiocese of New York*, 2023 WL 1993332, at *12–13 (S.D.N.Y. Feb. 14, 2023) (citing cases); *Edwards v. Huntington Union Free Sch. Dist.*, 957 F. Supp. 2d 203, 211 (E.D.N.Y. 2013) ("Plaintiff has failed to provide evidence that being required to teach two classes in addition to his administrative duties was a material change in his employment. It is undisputed that Plaintiff's title and salary remained the same."); *Hernandez v. City of New York*, 2013 WL 593450, at *3 (E.D.N.Y. Feb. 13, 2013) ("Plaintiff fails to provide any facts to support his allegation that being placed on desk duty has materially diminished his terms of employment.").

Finally, the allegations of false accusations of Plaintiff having stolen tips do not suffice as an adverse employment decision. Plaintiff alleges that he was scrutinized and not allowed to go behind the cash register as a result of the accusations, but he does not allege why such responsibility would be material to his employment. Dkt. No. 30 ¶¶ 65–66. Such allegations are insufficient to allege an adverse employment action. *See*, *e.g.*, *Langella v. Mahopac Cent. Sch. Dist.*, 2022 WL 44776, at *7 (S.D.N.Y. Jan. 5, 2022) (suspension with pay based on false accusations not an adverse employment action); *Chang v. City of N.Y. Dep't for the Aging*, 2012 WL 1188427, at *6 (S.D.N.Y. Apr. 10, 2012), *adopted by*, 2012 WL 2156800 (S.D.N.Y. June 14, 2012) (concluding that plaintiff's receipt of a "Notice and Statement of Charges," which contained allegations of code of conduct violations and resulted in an "informal conference" wherein he was suspended without pay for five days, did not constitute an "adverse employment decision"); *Scott v. Cellco P'ship*, 2007 WL 1051687, at *2 (S.D.N.Y. Apr. 3, 2007) (concluding

that "excessive scrutiny" due to accusations does not constitute an adverse employment action);

*Roff v. Low Surgical & Med. Supply, Inc.*, 2004 WL 5544995, at *7 (E.D.N.Y. May 11, 2004)

(citing cases).

Plaintiff's remaining allegations are that he was placed at the upper level of the restaurant

and that he was terminated.  A restaurant's conduct in consistently giving a waiter less desirable

tables to wait can constitute an adverse employment decision, particularly where the

compensation of waiters is based on tips and where there is a correlation between the desirability

of a table and the amount of the tip.  The Second Circuit has stated, albeit in a summary order,

that "for a restaurant server, a profession where wage is determined almost solely by tips, the

consistent decision to place the plaintiff in a section with fewer customers than anywhere else

*could amount to a decreased wage*, and, *if combined with other disadvantages*, could rise to the

level of an 'adverse employment action.'"  *Rowe v. Jagdamba, Inc.*, 302 F. App'x 59, 62 (2d Cir.

2008) (quoting *Reed v. Cracker Barrel Old Country Store, Inc.*, 133 F. Supp. 2d 1055, 1071

(M.D. Tenn. 2000)) (emphasis added).  But Plaintiff's own allegations undercut any notion that

he had suffered any sort of decreased wage.  While he alleges that he "made the least amount of

money in tips out of everyone," Dkt. No. 30 ¶ 50, the amended complaint affirmatively alleges

that all tips were "pooled" before the last month of employment, and that it was not until the last

month that each server "received their own set of tips that they made," *id*. ¶ 72.  It therefore

appears that there was no direct relation between the tables that Plaintiff was assigned to serve

and the tips he received.  His tips were based on the tips received from all tables, regardless of

whether he waited them.  Plaintiff does allege that for three weeks in December, he received tips

only on the basis of the tables he waited.  But those weeks were only three out of the twenty-nine

weeks during his employment with Lobster House and Plaintiff makes no allegations that he had

a materially lower wage during those three weeks.  In other words, Plaintiff never alleges that his salaries resulting from that outcome—of three weeks of individualized tip determinations at the tables upstairs and pooled tipping otherwise during the entirety of his tenure at the Lobster House—led to a decreased wage relative to what he would have otherwise received if the assignments were more equitably assigned such as to not be based on alleged racial discrimination.  *See also Fotiou v. Kalahari Resorts*, 2020 WL 3473970, at *9 (M.D. Pa. May 8, 2020), *report and recommendation adopted*, 2020 WL 3469058 (M.D. Pa. June 25, 2020) ("[A] server's assignment to fewer tables is not an adverse employment action without *significant* financial impact on the server as a result of the assignment." (emphasis added)); *Hughes v. Texas Keg Steakhouse & Bar, Inc.*, 2006 WL 708158, at *3 (N.D. Tex. Mar. 21, 2006) (noting on summary judgment that a waitress's assignment to "bad tables" at back of restaurant was not an adverse employment action without "evidence that such placement affected her pay or benefits, or that it resulted in significantly different responsibilities").

The only conduct that Plaintiff alleges that can constitute an adverse employment action is his termination.  Both parties agree that Plaintiff's termination constituted an adverse employment decision.  *See* Dkt. No. 33 at 6; Dkt. No. 34 at 13; Dkt. No. 35 at 11; *see also Feingold v. New York*, 366 F.3d 138, 160 (2d Cir. 2004) (stating that a termination constituted an adverse employment action).

### B.    Inference of Discriminatory Intent

At the motion to dismiss stage, "[a] plaintiff need only allege facts that give 'plausible support to a minimal inference of discriminatory motivation.'" *Menaker v. Hofstra Univ.*, 935 F.3d 20, 30 (2d Cir. 2019); *see also Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015) ("The facts alleged must give plausible support to the reduced requirements that arise

under *McDonnell Douglas* in the initial phase of a Title VII litigation.").[9]   "An inference of discrimination can arise from circumstances including, but not limited to, the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge."   *Id.* at 312.   "While a discrimination complaint need not allege facts establishing each element of a prima facie case of discrimination to survive a motion to dismiss, it must at a minimum assert nonconclusory factual matter sufficient to nudge its claims across the line from conceivable to plausible to proceed."   *E.E.O.C. v. Port Auth. of New York & New Jersey*, 768 F.3d 247, 254 (2d Cir. 2014).

Plaintiff's sparse allegations fail to cure the deficiencies in the original complaint. Plaintiff makes the following edits: Plaintiff deletes the allegation that he was a "runner" contained in the original complaint, *see* Dkt. No. 1 ¶ 28, instead now alleging in the amended complaint that he was "employed by Defendants as a server/waiter," Dkt. No. 30 ¶ 6.   For the two white comparators, Kimberly Ann Gomez and Kasey Karisaridis, Plaintiff adds that both were "hired by Defendants as a server," *id.* ¶¶ 40, 42.   The remainder of allegations in both complaints are substantially the same.   His allegations with respect to both Gomez's and Karisaridis's responsibilities are limited to the allegations that they were "never asked to clean other tables; run food to other tables."   *Id.*   Gomez was also never asked to "clean the restaurant

---

[9] Cases discussing the pleading standard for Title VII and Section 1983 are generally applicable to Section 1981 claims.   *See Hu v. City of New York*, 927 F.3d 81, 96 (2d Cir. 2019) (describing how the similarity standard in *Graham* applies to Title VII, Section 1981, and Equal Protection claims); *see also Brown v. City of Oneonta, New York*, 221 F.3d 329, 339 (2d Cir. 2000) ("[P]laintiffs must meet the same pleading standard for their [Section] 1981 claims as for their [Section] 1983 claims under the Equal Protection Clause.").

at the end of the evening." *Id*. ¶ 40.  He also alleges that "workers such as Kimberly and Kasey were never required to work in that [upstairs] section of the restaurant." *Id*. ¶ 48.

Even assuming Plaintiff had alleged an adverse employment action, he does not allege facts that give rise to a discriminatory intent.  Plaintiff does not allege that the Individual Defendants made any invidious and racial comments to him or that they made any comments about those in his protected group.  Nor does he allege facts that would support that the sequence of events leading to his termination (due to taking pictures of the register) reflected racial discrimination.  Plaintiff attempts to draw a plausible inference of discriminatory intent by alleging that he was treated differently from similarly situated employees of a different race, but to meet this burden as to a claim of disparate treatment, a plaintiff "must allege facts to establish that 'she was similarly situated in all material respects to the individuals with whom she seeks to compare herself.'"  *Batiste v. City Univ. of New York*, 2017 WL 2912525, at *9 (S.D.N.Y. July 7, 2017) (quoting *Mandell v. Cty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003)).  "Whether the plaintiff and these comparator employees are similarly situated in 'all material respects' will vary from case to case, and while the plaintiff's and comparator's circumstances must bear a reasonably close resemblance, they need not be 'identical.'"  *Carris v. First Student, Inc.*, 682 F. App'x 30, 32 (2d Cir. 2017).  The "similarly situated" standard "varies somewhat from case to case and . . . must be judged based on (1) whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness."  *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000).  "Ordinarily, '[w]hether two employees are similarly situated . . .  presents a question of fact,' rather than a legal question to be resolved on a motion to dismiss."  *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 230 (2d Cir. 2014).

The May 2022 Opinion dismissed the original complaint without prejudice because it did not "plead the minimal inference of discrimination as part of the prima facie case." Dkt. No. 29 at 9. Although Plaintiff had identified two employees who purportedly received preferential treatment, he had not plainly alleged the job that he was hired to perform or the jobs that the alleged comparators were hired to perform. *Id*. The Court concluded that the "allegations make it as or more plausible that he had different job responsibilities because he was hired to perform different job responsibilities." *Id*. at 10. As to his termination, Plaintiff had failed to allege that there were any other employees who engaged in comparable conduct who were not terminated. *Id*.

Plaintiff's pleadings still do not provide "minimal support" for an inference of discriminatory intent as to either assignment of tables or his termination. Plaintiff relies entirely on a comparison to persons he alleges are similarly situated to him—primarily Gomez and Karisaridis. All that the pleadings identify that make the two similarly situated is that they both have approximately the same title. Karisaridis and Gomez are both alleged to "hired" as "server[s]," but are not alleged to have been hired as "waiters," Dkt. No. 30 ¶¶ 40, 42. Plaintiff, meanwhile, was explicitly hired to be both a "server" and a "waiter." *Id*. ¶ 27. Plaintiff also alleges that Gonzalez was hired as both a "server" and "waiter," and "under plaintiffs' [sic] belief and understanding" was "to be plaintiffs' [sic] replacement due to him joining the *Red Panda* lawsuit." *Id*. ¶¶ 36–37. Gonzalez was also required to "clean tables and act more as a busser than what he was hired to do which was be a server/waiter." *Id*. ¶ 37.

Plaintiff's amended pleadings, again, on their face do not "plainly allege" the job he was hired to perform, and thus it is "as or more plausible that he had different job responsibilities

because he was hired to perform different job responsibilities." Dkt. No. 29 at 9. That Plaintiff's replacement undertook the same roles further supports that inference. *Id*.

Plaintiff fails to allege sufficient facts to establish that he (and Gonzalez) were similarly situated to Karisaridis and Gomez. Plaintiff fails to allege any facts to establish that the role of server (held by Karisaridis and Gomez) is the same or similar to the role of server/waiter. Those two do not necessarily connote the same role or job responsibilities. *See*, *e.g.*, *Fonseca v. Dircksen & Talleyrand Inc.*, 2014 WL 1487279, at *2 (S.D.N.Y. Apr. 11, 2014) (contrasting front of house servers with back-of-house waiter positions); *Whitehorn v. Wolfgang's Steakhouse, Inc.*, 275 F.R.D. 193, 196 (S.D.N.Y. 2011) (distinguishing "head waiters" and servers); *Hai Ming Lu v. Jing Fong Rest., Inc.*, 503 F. Supp. 2d 706, 708 (S.D.N.Y. 2007) (describing "waiters," "head waiters," and "servers" as distinct categories of "wait staff"). Moreover, even to say that two persons are "waiters" does not without more connote that they are similarly situated in all material respects. Restaurants and waiters do not come in a single size or form. Restaurants differ from one another, just as the position of waiter does. Waiters may be assigned differing responsibilities based on seniority; waiters with more experience may be trusted to handle larger tables, certain busy shifts, or tables with more rapid turnover. More experienced waiters with longer tenure may be more knowledgeable about the menu and food ingredients, while less experienced waiters may simply serve food. Sometimes waiters are expected to provide entertainment. *See*, *e.g.*, *Don The Beachcomber v. N.L.R.B.*, 390 F.2d 344, 345 (9th Cir. 1968) (describing a "waiter-rotation system under which senior waiters were entitled to serve the better tables"); *Hussain v. Burton & Doyle of Great Neck LLC*, 2020 WL 13574960, at *2 (E.D.N.Y. Feb. 24, 2020) (describing "senior server role" in which the server "also worked one shift a week as a sommelier"); *Morgan v. SpeakEasy, LLC*, 625 F. Supp. 2d

632, 639 (N.D. Ill. 2007) (describing context in which "[s]enior servers had more seniority and experience, as well as greater responsibilities within the restaurants. Specifically, senior servers helped with closing, occasionally served food and drinks to tables, served as greeters, and checked on tables during the dinner service"); John Bowe, Marisa Bowe & Sabin Streeter, Gig: Americans Talk About Their Jobs 232–36 (2001) (waitress recounting her work experiences, distinguishing between a "server" and an "order-taker," describing range of responsibilities, and distinguishing "corporate" versus "family-owned" restaurants). For some businesses, experience, qualifications, and seniority will be important for a waiter's role; in others, it may be unimportant. Plaintiff does not include any details about the seniority, work experience, salary, shifts, or anything else that might establish that the two are similarly situated. Indeed, Plaintiff never generally alleges the role of a server at Lobster House; he only asserts that *his* particular role "[a]s a server . . . [was] to take orders and make sure that the customers were having a pleasant experience at Defendants [sic] place of business." Dkt. No. 30 ¶ 27. He does not allege any facts as to his role of a "waiter." Nor does he allege facts showing that he is similarly situated with respect to Karisaridis and Gomez as to what is required of a server. All that he alleges, with respect to the responsibilities of Karisaridis and Gomez, is the entirely circular description that they "preformed [sic] the duties of a server." *Id.* ¶ 42. There are, in other words, no allegations tending to establish that a "server is a server is a server," or any allegations about the positions or roles at Lobster House that would allow the Court to infer that comparability based on such barebones allegations of title is warranted at the Lobster House. *See*, *e.g.*, *Port Auth. of New York & New Jersey*, 768 F.3d at 252 (rejecting, for the purposes of an Equal Pay Act claim, the EEOC's theory that "an attorney is an attorney is an attorney"). The amended complaint thus asks the Court to permit the case to go forward on the facile and impermissibly

conclusory basis that simply because Plaintiff shares a title that resembles the title given to

Karisaridis and Gomez, he is similarly situated to them and was presumptively entitled to be

given similar table assignments.  Those allegations are insufficient to give rise to the inference

that because Plaintiff did not get the same assignments as Karisaridis and Gomez, Defendants

discriminated against Plaintiff on the basis of race.  *See*, *e.g.*, *Johnson v. Andy Frain Servs., Inc.*,

638 F. App'x 68, 70 (2d Cir. 2016) (affirming dismissal of complaint because it "did not allege

that she and her co-worker had similar job descriptions or responsibilities"); *see also Batiste*,

2017 WL 2912525, at *9 ("While the Amended Complaint states that Louie was a 'direct report'

of Clarke, there is no allegation that Plaintiff and Louie had similar job descriptions or

responsibilities, a prerequisite to raising an inference of discrimination based on disparate

treatment."); *Wegmann v. Young Adult Inst., Inc.*, 2016 WL 827780, at *10 (S.D.N.Y. Mar. 2,

2016) ("She fails, however, to specify when or for how long she held any given position, or the

respective positions, responsibilities, tenure, or experience of the male Plan participants.").[10]

---

[10] Plaintiff also attempts to allege the existence of other comparators, but those persons are
clearly dissimilar to Plaintiff.  Plaintiff alleges in a lone paragraph that "all the defendants that
*acted* like servers, Mengxing Wang; Song Qiang Wang and Haifan Wang, were not required to
clean tables; run food to tables or clean the restaurant at the end of the evening."  Dkt. No. 30 ¶
43 (emphasis added).  Plaintiff does not allege that the title of the listed Individual Defendants
was, in fact, waiter or server.  In fact, by Plaintiff's allegations in his amended complaint,
Mengxing Wang was the "day-to-day manager," with duties such as "supervis[ing] plaintiff and
other work staff" and "creating the weekly schedule," *id.* ¶¶ 15–17, and Haifan Wang "had
"managerial authority of the waitstaff," *id.* ¶ 20, and Song Qiang Wang, along with the others,
was a "manager[] and/or supervisor[] of plaintiff," *id.* ¶ 92.   Those named Defendants were
alleged to be the managers of Plaintiff.  They were not similarly situated because by Plaintiff's
admission, they had different seniority and did not report to the same supervisor.  *See Cooper v.
Templeton*, 2022 WL 4367445, at *4 (S.D.N.Y. Sept. 21, 2022) (dismissing a complaint because
one was a "executive-level employee" while plaintiff was a "portfolio manager"); *Dickens v.
Hudson Sheraton Corp., LLC*, 167 F. Supp. 3d 499, 521 (S.D.N.Y. 2016), *aff'd*, 689 F. App'x
670 (2d Cir. 2017) (dismissing when there was no evidence that plaintiff and "comparators
reported to the same supervisor, were tasked with similar responsibilities, or were otherwise
similarly situated"); *Akinyemi v. Chertoff*, 2008 WL 1849002, at *5 (S.D.N.Y. Apr. 25, 2008)
("Whether or not a plaintiff reports to the same supervisor as her comparator is an important

The amended complaint also does not allege an inference of discriminatory intent with respect to Plaintiff's termination.  No new allegations are pleaded with respect to the conduct of Karisaridis and Gomez or any other comparator.  Plaintiff does not allege that they had any infractions similar to Plaintiff—let alone any that involved the cash register or seeking payroll information.  Like in the original complaint, Plaintiff has failed to allege that they are comparable with respect to his only adverse employment action.  *See* Dkt. No. 29 at 9–10; *see, e.g.*, *Marcus v. Leviton Mfg. Co., Inc.*, 661 F. App'x 29, 32 (2d Cir. 2016) ("Without any information as to . . . the specifics of their conduct, the mere allegation that two other employees—one younger and one similar in age—used profanity without being fired does not give rise to even a minimal inference of age discrimination."); *Dooley v. Jetblue Airways Corp.*, 2015 WL 1514955, at *3 (S.D.N.Y. Apr. 1, 2015), *aff'd in relevant part, vacated in part, remanded*, 636 F. App'x 16 (2d Cir. 2015) (affirming dismissal because comparators did not engage in similar conduct); *see also See Moore v. City of New York*, 2017 WL 35450, at *12 (S.D.N.Y. Jan. 3, 2017) ("Beyond merely identifying himself as an African American male and noting that a number of [the] [d]efendants involved in the alleged adverse actions suffered by [the plaintiff] are 'white' and/or 'female,' [the plaintiff] proffers no other facts to support his claim that [the] [d]efendants took action against him because of his membership in a protected class."), *report and recommendation adopted*, 2017 WL 1064714 (S.D.N.Y. Mar. 20, 2017).

## III.  Hostile Work Environment under 42. U.S.C. § 1981

Plaintiff realleges that he was subject to a hostile work environment in violation of Section 1981.  The Court, in its May 2022 Opinion, dismissed the hostile work environment claim because "the functions Plaintiff was asked to perform are functions that are typically

---

factor in finding that plaintiff and the comparator are similarly situated.") (citing cases).

performed in a restaurant." Dkt. No. 29 at 12.  The amended complaint does not offer any new allegations that would warrant revisiting that conclusion.  Like the original complaint, there are "no allegations of racial slurs or comments directed at [Plaintiff]," *id.,* and the Court again also concludes that "there also are no allegations that similarly situated individuals were treated differently," *id.*  Plaintiff reorganizes his amended complaint into separately defined categories but does not add any allegations that undermines the substance of the Court's May 2022 Opinion.  No reasonable person would find that the additional responsibilities that Plaintiff undertook, or any of the other alleged slights against Plaintiff, constituted a hostile work environment.  The Court again concludes that, in the absence of any allegations that would satisfy the elements of a hostile work environment claim, Count II must be dismissed.

## IV.    New York State and New York City Claims

Like in the March 2022 Opinion, because the federal claims are dismissed, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining claims under state and local law.  *See* 28 U.S.C. § 1367(c)(3); *Klein & Co. Futures v. Bd. of Trade of City of N.Y.*, 464 F.3d 255, 262 (2d Cir. 2006) ("It is well settled that where . . . the federal claims are eliminated in the early stages of litigation, courts should generally decline to exercise pendent jurisdiction over remaining state law claims." (collecting cases)).

## CONCLUSION

The motion to dismiss is GRANTED with prejudice with the exception of the New York

State and New York City claims which are dismissed without prejudice.  The Clerk of Court is

respectfully directed to close Dkt. No. 32 and to close the case.

SO ORDERED.

Dated: March 13, 2023
     New York, New York
                                            LEWIS J. LIMAN
                                United States District Judge